ATTORNEY GRIEVANCE COMMISSION OF MARYLAND *v.* MARVIN MANDEL

[Misc. (BV) No. 16, September Term, 1977.]

*Decided October 28, 1982.*

The cause was argued before SMITH, COLE and RODOWSKY, JJ., and JAMES C. MORTON, JR., EDWARD O. WEANT, JR., and JOHN J. GARRITY, Associate Judges of the Court of Special Appeals and JOHN E. RAINE, JR., Chief Judge of the Third Judicial Circuit, specially assigned.

*Glenn M. Grossman, Assistant Bar Counsel,* with whom was *Melvin Hirshman, Bar Counsel,* on the petition, for petitioner.

*M. Albert Figinski,* with whom was *Arnold M. Weiner* on exceptions, for respondent.

SMITH, J., delivered the opinion of the Court. GARRITY, J.,

concurs in the result, and filed a concurring opinion at page 589 *infra.*

We shall impose the ultimate sanction of disbarment in this attorney disciplinary matter based upon a mail fraud conviction.

I

Marvin Mandel was admitted to the bar of this Court on October 8, 1942. On November 2, 1977, Bar Counsel, acting on behalf of the Attorney Grievance Commission of Maryland, filed a petition pursuant to Maryland Rule BV16 in which he requested that we suspend Mandel from the practice of law until the further order of this Court.[1] This

---

1. In 1977 Maryland Rule BV16 provided:

"a. *Filing Charges.*

"If an attorney is convicted in any judicial tribunal of a crime involving moral turpitude, whether the conviction results from a plea of guilty or of nolo contendere or from a verdict after trial, and regardless of the pendency of an appeal or any other post-conviction proceeding, the Bar Counsel shall file charges with the Court of Appeals alleging the fact of the conviction and requesting that the attorney be suspended from the practice of law. A certified copy of the judgment of conviction shall be attached to the charges and shall be prima facie evidence of the fact that the attorney was convicted of the crime charged.

"b. *Order.*

"The Court of Appeals shall issue an order to show cause why the attorney should not be suspended from the practice of law until the further order of the Court of Appeals. Upon consideration of the charges and the answer to the order to show cause, the Court of Appeals may enter an order, effective immediately, suspending the attorney from the practice of law until its further order. The provisions of Rule BV13 apply to the suspension.

"c. *Further Proceedings.*

"In any case in which the Court of Appeals has entered an order suspending an attorney until its further order, pursuant to this Rule, further proceedings on the charges shall be conducted pursuant to Rules BV9 (Charges), BV10 (Hearings) and BV11 (Disposition of Charges), to determine whether the crime warrants discipline and if so, the extent thereof. If the attorney has appealed from his conviction, the hearing shall be delayed until completion of the appellate process. If the conviction is reversed at any stage of the appellate process, the suspension shall be terminated. If after the completion of the appellate process, the conviction has not been reversed, or if the attorney does not seek appellate review of

petition was based upon Mandel's conviction by a jury in the United States District Court for the District of Maryland of violation of 18 U.S.C. § 1341 (mail fraud — fifteen counts) and 18 U.S.C. § 1961 et seq. (racketeering — one count). In response to that petition, Mandel prayed that we "pass an order deferring a determination of the merits of the Petition ..., including the question of moral turpitude" and that we also pass an order suspending him "from the further practice of law until [our] further order or until such time as the respondent's conviction ... is reversed on appeal, whichever is the earlier to occur ...." Accordingly, we suspended Mandel on December 1, 1977, "effective immediately ...." The suspension was "without prejudice to [his right] to raise the issue of moral turpitude in further proceedings ...."

Mandel's conviction was affirmed on appeal. See *United States v. Mandel,* 591 F.2d 1347 *(Mandel I),* 602 F.2d 653 *(Mandel II),* 609 F.2d 1076 (4th Cir. 1979), *cert. denied* 445 U.S. 961 (1980). We shall have more to say about that affirmance since it is a significant part of Mandel's contentions here. He continues to stand suspended from the practice of law in this State. He was disbarred in the United

---

the conviction, the hearing shall be held within a reasonable time after the mandate is issued, or, if no appellate review is sought, within a reasonable time after the expiration of the time for appeal from the conviction. However, if the attorney is incarcerated following termination of the appellate process or expiration of the time for an appeal (if no appeal has been taken), the hearing shall be set within a reasonable time following termination of incarceration unless the attorney

    (i) requests an earlier hearing; and

    (ii) makes all arrangements, including financial arrangements, for his presence at the earlier hearing on the date set by the Court."

We amended the rule in 1978 to make it applicable "to convictions in any one or more of the following categories: (i) in any Maryland court of a felony, (ii) in any federal court of a felony, unless the same crime also is a crime under Maryland law and is not a felony, (iii) in any other judicial tribunal of a crime which would have been a felony under Maryland law had the crime been committed in Maryland, and (iv) in any judicial tribunal of any other crime punishable by imprisonment for three years or more." See *Attorney Griev. Comm'n v. Klauber,* 283 Md. 597, 391 A.2d 849 (1978) *(Klauber I),* and *Attorney Griev. Comm'n v. Klauber,* 284 Md. 306, 307, 396 A.2d 253 (1979) *(Klauber II).*

States District Court for the District of Maryland on July 9, 1980.

Mandel was sent to prison. Under Rule BV16 c, in the absence of a request from the attorney, further disciplinary action is postponed until a reasonable time after completion of incarceration. See *Attorney Griev. Comm'n v. Andresen,* 279 Md. 250, 253-54, 367 A.2d 1251 (1977).

II

Promptly after Mandel was released from prison Bar Counsel, acting on behalf of the Attorney Grievance Commission, filed a petition seeking disciplinary action against Mandel upon the basis of this conviction. He alleged that Mandel had violated Disciplinary Rules 1-102 (A)(1), (3), (4), (5), and (6).[2]

Pursuant to Rule BV9, we designated the Honorable J. Harold Grady, Chief Judge of the Eighth Judicial Circuit of Maryland, to hear the charges. He filed a report with us which states in pertinent part:

"In his Answer to Charges, the Respondent admits all of the facts above stated, but denies that he is subject to disbarment contending that the crimes of which he was convicted do not constitute misconduct violative of Disciplinary Rule 1-102 .... In particular the Respondent contends that the crimes of which he was convicted do not involve

---

2. The rules in question state:

"DR 1-102 Misconduct.
  (A) A lawyer shall not:
      (1) Violate a Disciplinary Rule.
      (2) ...
      (3) Engage in illegal conduct involving moral turpitude.
      (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
      (5) Engage in conduct that is prejudicial to the administration of justice.
      (6) Engage in any other conduct that adversely reflects on his fitness to practice law."

moral turpitude and that to so find unconstitutionally deprives the Respondent of due process under both the United States Constitution and the Maryland Constitution."

After a discussion of cases in this Court such as *Attorney Griev. Comm'n v. Pine,* 291 Md. 319, 435 A.2d 419 (1981); *Attorney Griev. Comm'n v. Klauber,* 289 Md. 446, 423 A.2d 578 (1981) *(Klauber III);* and *Maryland St. Bar Ass'n v. Rosenberg,* 273 Md. 351, 329 A.2d 106 (1974), Judge Grady quoted from Rule BV 10 e 1 which states in pertinent part:

"In a hearing of charges pursuant to this Rule, a final judgment by a judicial tribunal in another proceeding convicting an attorney of a crime shall be conclusive proof of the guilt of the attorney of that crime."

He then said:

"The provisions of this Rule in conjunction with the decisions in *Klauber III* and *Pine, supra,* compel the conclusion that this court may not examine the factual underpinnings of the Respondent's federal conviction and must find that he has been convicted of a crime involving moral turpitude."

Judge Grady rejected Mandel's contention that the posture of his case in the United States Court of Appeals rendered his conviction devoid of precedential value or any substance in these proceedings and thus that due process precluded the use of this conviction as conclusive proof of guilt of a crime involving moral turpitude. In so doing, the trial judge quoted from *Rosenberg,* 273 Md. 351. He then made the following findings of fact and conclusions of law:

## "FINDINGS OF FACT

"Respondent was convicted, after a jury trial in the United States District Court for the District of Maryland, of violations of the United States Code, Title 18, Sections 1341 and 2 (mail fraud, aiding

and abetting), Sections 1961, 1962(b) and (c), 1963 and 2 (prohibited activities; aiding and abetting) and thereafter was sentenced to concurrent terms of imprisonment for three years.

## "CONCLUSIONS OF LAW

"1. The federal crime of mail fraud is a crime involving moral turpitude.

"2. By virtue of his conviction of federal mail fraud, Respondent has violated the following Disciplinary Rules:

DR 102(A) (1)
DR 102(A) (3)
DR 102(A) (4)
DR 102(A) (5)
DR 102(A) (6)"

## III

Mandel excepted to Judge Grady's findings of fact and conclusions of law. The exceptions may be summarized: (1) since "[t]he only federal appellate majority opinion" relative to his conviction called for a reversal, the subsequent affirmance of his conviction by a tie vote "should not be sufficient to allow the conviction, ipso facto, to be used to disbar since an en banc federal appellate tie is without precedential value" and thus in this instance should not be considered as a final judgment under Rule BV10 e 1; (2) the mail fraud statute was improperly applied "to a scheme to defraud a sovereign State and its citizens of the faithful services of their Governor"; (3) a code of ethics not applicable by its terms to the Governor of Maryland was impermissibly permitted to be used by the jury as a standard for judging him; (4) "[t]he federal court admitted a vast quantity of unwashed hearsay which the Government offered as 'the central part of its case.' 591 F.2d at 1367"; and (5) he does not stand convicted of a crime involving moral turpitude

because his case is distinguishable from *Klauber III,* 289 Md. 446. He opened his memorandum in support of his exceptions by stating, "There is no doubt that Respondent was convicted of mail fraud and incarcerated therefor. The sole question, now, is whether Respondent should be disbarred therefor."

The term "misconduct" in its application to attorney disciplinary matters is defined in Rule BV1 j as "an act or omission by an attorney, individually or in concert with any other person or persons which violates the Disciplinary Rules of the Code of Professional Responsibility, as adopted by Rule 1230, whether or not the act or omission occurred in the course of an attorney-client relationship."

In *Mandel I,* 591 F.2d 1347, a divided court reversed the convictions of Mandel and his co-defendants on the basis of a jury instruction and the admissibility of certain evidence. The court said as to the jury instruction:

> "We think it was necessary for the jury to be charged that Governor Mandel could not be convicted under § 1341 for engaging in a scheme to defraud that involved the fraudulent misrepresentation of facts to, or such concealment of material information from, the 1972 Maryland General Assembly, without first finding that he knew that some or all of the other Appellants were among the true owners of Marlboro Race Track during the 1972 session of the Maryland General Assembly." 591 F.2d 1365.

It held that the trial judge erred by allowing the Government to introduce into evidence certain parts of the Maryland Code of Ethics "to prove circumstantially an intent to defraud on the part of Governor Mandel." 591 F.2d at 1366. It said it did "not think admittedly inapplicable standards of conduct had a proper place in the trial, especially when perfectly valid standards existed." 591 F.2d at 1367. It also held the trial judge erred in admitting certain evidence "under Federal Rule of Evidence 803 (24), the

catch-all exception to the hearsay rule." *Id.* However, the court "reject[ed] Appellants' contention that the use of the mail fraud statute in th[at] case constitute[d] an impermissible federal intrusion into the political affairs of the State of Maryland." 591 F.2d at 1359. It determined that "Appellants' contention that their convictions were based on an unwarranted overextension of the mail fraud statute [was] likewise without merit." 591 F.2d at 1359. The court disposed of contentions that the mail fraud statute should not have been applied to the case before it by stating:

> "[I]t is apparent that the mail fraud case could have been submitted on either or both of two theories on the indictment and record now before us. First, that Governor Mandel had either been bribed as a part of a scheme to defraud or that attempts had been made to bribe Governor Mandel as a part of such scheme. Second, that false information was presented to, or true information concealed from, the Maryland General Assembly or Maryland Racing Commission, or both, in order to induce those bodies to take favorable action toward those interested in Marlboro, and later Bowie. It is equally as apparent that the case could not have been submitted on the theory that Governor Mandel had a direct interest in the racetrack business, for no direct connection on his part was either alleged or proven." 591 F.2d at 1364.

The case was reargued before the court en banc. *Mandel II,* 602 F.2d 653 (4th Cir. 1979). The court stated:

> "The judgments of conviction are affirmed by an equally divided court.
>
> "A majority of the members of the *en banc* court would affirm the judgments of conviction against all of the contentions of the appellants except the claim of error in the charge to the jury which was the point upon which there was equal division." 602 F.2d at 653.

Thus, it will be seen that the contentions relative to an equally divided court are applicable only to the first of Mandel's exceptions.

We have previously quoted from Rule BV10 e and its provision that in disciplinary matters a final judgment by a judicial tribunal in another proceeding convicting an attorney of a crime is conclusive proof of the guilt of the attorney of that crime. The Maryland rule is not unique. Similar rules or statutes are found in many states.[3] Prior to the adoption of our present Rule BV10 the Court was faced with a contention in *Braverman v. Bar Assn. of Balto.,* 209 Md. 328, 121 A.2d 473, *cert. denied,* 352 U.S. 830 (1956), that a con-

---

3. *See, e.g.,* Ala. S.C.R. Disc. Enf. 14(b); *In re McDonald,* 292 Ala. 426, 296 So.2d 141 (1974); Ariz. S.C.R. 29(c); *Matter of Goldman,* 124 Ariz. 105, 602 P.2d 486 (1979); Ark. S.C.R. Prof. Conduct Attns. X; *Matter of Jones,* 256 Ark. 1106, 509 S.W.2d 294 (1974); Cal. Bus. & Prof. Code § 6101 (West 1974); *In re Duggan,* 17 Cal.3d 416, 551 P.2d 19, 130 Cal. Rptr. 715 (1976); Colo. R.P. Law. Disc. 241.16; D.C. Code Ann. § 11-2503(a) (1981); *Matter of Colson,* 412 A.2d 1160 (D.C. 1979); Fla. Bar Int. Rule Art. 11, Rule 11.07(1) and (4); *The Florida Bar v. Prior,* 330 So.2d 697 (Fla. 1976); Idaho Code § 3-301 1 (1979); *In re Snook,* 94 Idaho 904, 499 P.2d 1260 (1972); Ill. S.C.R. 761; *In re Callas,* 82 Ill.2d 6, 411 N.E.2d 273 (1980); Iowa Code Ann. § 610.24 (West 1975); *Committee on Professional Ethics & C. v. Bronemann,* 210 N.W.2d 607 (Iowa 1973); Kan. S.C.R. Attn. Disc. 202; *In re Evans,* 229 Kan. 182, 621 P.2d 991 (1981); La. S.C.R. XIX, Art. Inc. La. St. Bar, Art. 15, § 8 (7) (c); *Louisiana State Bar Ass'n v. Tunis,* 352 So.2d 623 (La. 1977); *State Bar v. Gillis,* 402 Mich. 286, 262 N.W.2d 646 (1978); Minn. R.P.R. 19(a); *Matter of Hedlund,* 293 N.W.2d 63 (Minn. 1980); Miss. Code Ann. § 73-3-339 (1972, 1981 Cum. Supp.); *Mississippi State Bar v. Phillips,* 385 So.2d 943 (Miss. 1980); Mo. S.C.R. 5.20; Mont. Code Ann. § 37-61-301(2)(a) (1981); Nev. S.C.R. 111 3; *Matter of Bricker,* 90 N.J. 6, 446 A.2d 1195 (1982); N. M. Stat. Ann. § 36-2-18 A (1978); N.Y. Judiciary Law § 90 (Consol. 1976, 1982 Cum. Supp.); *Matter of Brasco,* 81 A.D.2d 118, 439 N.Y.S.2d 416 (1981); N.C.S. Bar R. § 15; N.D.R. Disc. P. 13(c); Ohio S.C. Gov. R. V (8)(a)(iii); *Bar Assn. v. Chvosta,* 62 Ohio St.2d 429, 406 N.E.2d 524 (1980); Or. Rev. Stat. § 9.480(2) (1981); *In re Claude M. Johns, Jr.,* 212 Or. 587, 321 P.2d 281 (1958); Pa. R.D.E. 214 (b); *Office of Disciplinary Counsel v. Eilberg,* 497 Pa. 387, 441 A.2d 1193 (1982); R.I.S.C.R. 42-12(b); *In re Andrew A. Bucci,* 119 R.I. 904, 376 A.2d 723 (1977); S.C.R. Disc. P. § 6 B; *Matter of Rish,* 273 S.C. 365, 256 S.E.2d 540 (1979); S.D. Codified Laws Ann. § 16-19-58 (1979); In re Kirby, 10 S.D. 322, 73 N.W. 92 (1897); Tenn. S.C.R. 9 § 14.3; Tex. Rev. Civ. Stat. Ann. Art. 320a-1 § 16(b) (Vernon 1973, 1982·Cum. Supp.); *Muniz v. State,* 575 S.W.2d 408 (Tex. Civ. App. 1978); Utah Code Ann. § 78-51-37 (1953), 1977 Repl. Vol.); *In re Pearce,* 103 Utah 522, 136 P.2d 969 (1943); Vt. S.C.A.O. 9 § 12(c); Va. S.C.R. Disc. P. Part 6, 13 D(2); Wash. D.R.A. 1.1(a); *In re Krogh,* 85 Wash.2d 462, 536 P.2d 578 (1975); W. Va. Code § 30-2-6 (1980 Repl. Vol.); Wisc. S.C.R. 11.03(5); *Disciplinary Proceedings Against Eisenberg,* 81 Wis.2d 175, 259 N.W.2d 745 (1977), *cert. denied,* 436 U.S. 946 (1978). *See also* Model Rules for Lawyer Disciplinary Enforcement Rule 18 F (Draft 1979); Model Federal Rules of Disciplinary Enforcement Rule I C (Draft 1978).

viction in the United States District Court was not conclusive upon the trial court before whom the attorney disciplinary matter was pending under the procedure then prevailing.[4] Judge Delaplaine discussed for the Court a New York statute providing for disbarment upon conviction of a felony and cases in Massachusetts and Pennsylvania holding that the record of conviction was conclusive of guilt even in the absence of a statute to that effect. However, since the trial judges there "considered everything which [Braverman] claimed was material and which he asked them to consider," the Court found no need "to state whether in a disbarment proceeding a judgment of conviction by another Court is conclusive or only *prima facie* evidence of guilt." 209 Md. at 343. Judge Delaplaine further said for the Court:

> "Generally speaking, the conviction of an attorney of any criminal offense which the law characterizes as infamous establishes *prima facie* his unfitness to be continued on the rolls of members of the bar and is sufficient cause of disbarment. *State ex rel. McLean v. Johnson,* 174 N.C. 345, 93 S.E. 847; *Ex parte Mason,* 29 Or. 18, 43 P. 651, 54 Am. St. Rep. 772. [Maryland Code (1951, 1955 Cum. Supp.) Art. 10, § 16] directs that every attorney who shall be found guilty of crime involving moral turpitude, or of conduct prejudicial to the administration of justice, or of being a subversive person, shall be suspended or disbarred from the practice of law." 209 Md. at 344.

This is not the first Maryland disciplinary proceeding under the present rules in which an attorney has attempted to attack the underlying conviction. We had such an attack in *Bar Ass'n of Balto. City v. Siegel,* 275 Md. 521, 340 A.2d 710 (1975). Siegel claimed that "compelling extenuating circumstances" should be grounds for not disbarring him.

---

4. Disciplinary actions must be filed in this Court now pursuant to a rule which became effective November 2, 1970.

Those circumstances were (1) a recommendation against prosecution by "two highly respected United States Attorneys, Stephen H. Sachs and George Beall," (2) the "prosecution was overly zealously pursued," and (3) his inability for health reasons "to undergo an extended trial." Judge Digges there said for the Court:

"[W]e cannot accept as 'compelling extenuating circumstances' those proffers by the respondent which in essence call upon us to assess the integrity of the criminal conviction itself — that prior adjudication is conclusive and thus cannot be attacked in a disciplinary proceeding by invoking this Court to reweigh or to re-evaluate the respondent's guilt or innocence. This is so as we are prohibited from such a consideration by Rule BV4 f 1 . . . ." 275 Md. at 527.

Then Rule BV4 f 1 was the predecessor to our present Rule BV10 e 1.

Chief Judge Murphy had occasion to discuss the predecessor rule for the Court in *Rosenberg,* 273 Md. 351, stating:

"[O]ther states provide, as we do, by rule, statute, or case law, that a conviction of an attorney is conclusive proof of guilt. *See, e.g., In re Metheany,* 104 Ariz. 144, 449 P.2d 609 (1969); *In re Higbie,* 6 Cal. 3d 562, 99 Cal. Rptr. 865, 493 P.2d 97 (1972); *In re Fumo,* 52 Ill. 2d 307, 288 N.E.2d 9 (1972); *Kentucky State Bar Ass'n v. Lester,* 437 S.W.2d 958 (Ky. 1968); *In re Lurkins,* 374 S.W.2d 67 (Mo. 1964). The constitutionality of these procedures has not been seriously questioned. The requirements of due process having been satisfied at the criminal trial, and the attorney's guilt having been established beyond a reasonable doubt at that proceeding, a new or other inquiry into the guilt of the attorney for disciplinary purposes is not mandated by either the State or federal constitutions. Rule BV4 f 2 provides that, notwithstanding the provisions of Rule BV4 f

1, any party to a disciplinary proceeding may introduce additional evidence. While the question of guilt may not be relitigated, an opportunity for a meaningful hearing is thereby afforded to adduce evidence in mitigation of the offense in order to ascertain the appropriate disciplinary sanction to be applied for the attorney's misconduct." 273 Md. at 354-55.

Mandel's extensive contentions of trial error in the admission of evidence are unworthy of consideration because, as previously noted, the majority of the United States Court of Appeals rejected those contentions. The equal division was only on the claim of error in the charge to the jury.

Mandel would have us hold that because his conviction was affirmed on appeal by an equally divided court that this conviction is not a final judgment for the purposes of Rule BV10 e 1. Such simply is not the law. There is a difference between an opinion's having no precedential value, meaning that it has no binding effect upon future cases, because it is by an equally divided court, and the issue of whether it is a final judgment, binding upon the parties. We have found no case nor have we been cited to one indicating that such an affirmance is not a final judgment, binding upon the parties.

Affirmance of a judgment where an appellate court is equally divided on an appeal is a commonly understood procedure. *See generally* 5 Am. Jur. 2d *Appeal and Error* § 902 (1962) and 5B C.J.S. *Appeal and Error* § 1844 b (1958). Indeed, Maryland Constitution Art. IV, § 14 provides relative to this Court that "an equal division of those sitting in a case has the effect of affirming the decision appealed from if there is no application for reargument as [t]hereinafter provided."

There is nothing new about the concept of an affirmance where an appellate court is evenly divided. This Court did it in *Partridge v. Dorsey,* 3 H. & J. 302 (1813), and in *Hammond v. Ridgely,* 5 H. & J. 245, 284 (1821), both of which were decided prior to *The Antelope,* 23 U.S. (10

Wheat.) 66, 6 L.Ed. 268 (1825), and *Etting v. Bank of the United States,* 24 U.S. (11 Wheat.) 59, 6 L.Ed. 419 (1826). In the latter case Chief Justice Marshall concluded the opinion by saying for the Court:

"[T]he principles of law which have been argued cannot be settled; but the judgment is affirmed, the Court being divided in opinion upon it." *Id.* at 78.

Justice Powell said for the Court in *Neil v. Biggers,* 409 U.S. 188, 191-92, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), *The Antelope* appeared to be "the first occasion of an equal division" in the Supreme Court of the United States.

In *Groverman v. Spencer,* 7 Md. 214 (1854), the decree was affirmed by a divided court. Judge Mason announced for the Court:

"Although opinions representing the views of the different judges have been prepared, the whole court think it proper not to file them, for they determine nothing which would govern any future case, and therefore would in all probability lead to misapprehension hereafter. In future, in all cases of a divided court, a similar practice will be pursued." 7 Md. at 214-15.

This was explained by Chief Judge Bowie for the Court in *Johns v. Johns,* 20 Md. 58 (1863), after quoting from *Groverman:*

"It is to be presumed, the court did not in arriving at this conclusion, overlook the constitutional provisions of Art. 4, sec. 2, in relation to its organization, that 'in every case decided, an opinion in writing shall be filed,' but that, interpreting the clause, as applicable to cases in which there was a concurrence of a majority of the quorum, where the opinion would decide future cases, and as not applying to cases where there was a want of concurrence, and the opinions would be nullities, they held the latter to be out of the constitutional provi-

sion. The affirmance of the decree or judgment below, being a legal result, or necessary consequence of the equal division of the appellate court, it may well be doubted, whether there was any decision by the latter, in legal contemplation. The opinion in writing, required to be filed, is the opinion or mind of the court, considered as a unit, not as consisting of several conflicting minds, and when that unity does not exist in the minds of a majority of the court or quorum, there is no decision of the court, but the judgment or decree below stands affirmed, because the appellant has not succeeded in maintaining his motion to reverse. It is almost a solecism to say, an equal division, or disagreement on any point, is a decision." 20 Md. at 61-62.

In *Kolb v. Swann,* 68 Md. 516, 13 A. 379 (1888), Judge Stone said for the Court:

"In *Trimble v. African Methodist Bethel Church,* unreported, decided by this court at the January Term, 1887, the question, and indeed the only question involved, was the title of that church to a lot of about 2 acres of land sold to it by Robert Oliver for a grave yard. . . .

"The question and the only question involved in that suit, was whether the African Church had a good fee simple title to the whole of that grave yard lot? . . .

"Upon the case so brought before this court we held (by an equally divided court,) that the African Church had a good and merchantable title to the lot it had sold to the Trimbles, and in so deciding we necessarily decided that the African Church had a good and merchantable title to the whole of the grave yard lot." 68 Md. at 518-19.

Subsequent to that decision Swann bought one of the lots carved out of the graveyard lot and bargained to lease it to Kolb. The Court said the facts were precisely the same as in

Trimble's Case, except that there the question was presented between the church and its immediate grantee while in *Kolb* the question arose between a grantee of one of the building lots and his lessee. The Court then entered into a discussion as to whether the earlier decision by an equally divided court was binding in the circumstances:

"The binding force and effect of a judgment of a court of competent jurisdiction, and of all the legal consequences which flow from it, in no wise depend upon the number of judges who sat in the case, or who concurred in the judgment, provided only the court was legally organized. A judgment rendered by a mere majority, or by an equally divided court, where the law provides for the judgment by an equal division, is just as effective in all respects as if it were the unanimous decision of every judge upon the bench. Every legal consequence that belongs to any judgment follows a judgment so rendered. It is a lien on the real estate of the defendant; it can be plead as *res judicata* where the subject is again sought to be litigated between the same parties, and, in a word, has every attribute of a judgment rendered by the whole court, as far as that case is concerned.

"The only difference is, that a judgment rendered by an equally divided court has not the same authority in analogous cases, that one would have, rendered by a majority of the court, and where the reasons upon which it is founded appear in the opinion. For these views we have ample authority. *The Antelope,* 10 Wheat. 66; *Bridge Co. v. Stewart,* 3 How. 413; *Durant v. Essex Co.,* 7 Wall. 107, and 101 U.S. 555; *Mining Co. v. Mining Co.,* 3 Wall. 332; *Beloit v. Morgan,* 7 Wall. 619." 68 Md. at 520-21.

The Court concluded:

"We think, therefore, that the question of the title to this grave yard lot should not be reopened, unless

upon a case disclosing a different state of facts from what existed in the Trimble Case, or unless it had been shown affirmatively that our former decision was manifestly erroneous.

"But neither of these contingencies has arisen. The facts are the same, the argument is the same, and the authorities are the same, and therefore the decree must be the same." *Id.* at 522.

One of the leading cases, if not the leading case in Maryland, on res judicata is *Pat Perusse Realty v. Lingo,* 249 Md. 33, 238 A.2d 100 (1968). Chief Judge Hammond there said for the Court:

"The basic rule of res judicata is that facts or questions which were in issue in a previous action and were therein determined by a court which had jurisdiction of the parties and the subject matter are conclusively settled by a final judgment in the first case and may not again be litigated in a subsequent action between the same parties or their privies even though the subsequent suit takes a different form or is based on a different cause of action. *Sterling v. Local 438, etc.,* 207 Md. 132 [, 113 A.2d 389 (1955)]; *Snodgrass v. Stubbs,* 192 Md. 287 [, 64 A.2d 130 (1949)]; *De Maio v. Lumbermens Mutual,* 247 Md. 30 [, 230 A.2d 279 (1967)].

"A corollary of this rule has been the theory of mutuality — that estoppels must be mutual and one (as it happened a plaintiff in the second suit) who himself was not bound by the prior judgment cannot assert res judicata against him to whom it was adverse. *Groshon v. Thomas,* 20 Md. 234 [(1863)]." 249 Md. at 35.

He then went on to say, citing *Kolb* as one example, "Maryland has, in at least two instances, given hint that in a proper case the requirement of mutuality might not be insisted upon." *Id.* at 41. The Court held:

"Perusse, in its suit against Ted, had its full day in

court and full opportunity to win on its claim that it procured a buyer ready, willing and able to buy at the seller's price. Its claim was decided against it. There can be no doubt that it sought to relitigate that precisely identical issue in the attachment against Elizabeth. Public policy against repetitive identical litigation, which underlies the rule of res judicata, applies here with logic and force to provide that Perusse's rights were satisfied by having had its day in court on an issue, and that it is not entitled to another day in court against a particular defendant on that issue." 249 Md. at 45.

Citing *Durant v. Essex Co.,* 74 U.S. (7 Wall.) 107, 19 L. Ed. 154 (1869); *Kolb,* 68 Md. 516; *Lyon v. Ingham Circuit Judge,* 37 Mich. 377 (1877); and *McAlister v. Hamilton,* 61 S.C. 6, 39 S.E. 182 (1901), for authority, 2 A. Freeman, *Judgments* § 722 at 1529 (5th ed. 1925), states, "The effect of a judgment is not limited by the fact that on appeal it was affirmed on an equal division of the judges." A slightly more expansive statement, likewise citing *Durant,* is found in 2 H. Black, *Judgments,* § 528 (2d ed. 1902):

"It has sometimes been contended in argument that a judgment pronounced by a divided court was, for that reason, not conclusive. But the authorities distinctly declare that such a judgment is just as conclusive and binding upon the parties, in every respect, as if rendered upon the concurrence of all the judges upon every question involved in the case." *Id.* at 793.

Citing some of the same cases, 1 H. Herman, *Law of Estoppel and Res Judicata,* § 116 (1886), states, "The conclusiveness of a decision or decree of a court of last resort, is not vitiated by the fact that it is one of affirmance by a divided court, it forever settles the question decided as to that case."

In *Durant,* 74 U.S. (7 Wall.) 107, Justice Field stated for the Supreme Court:

"There is nothing in the fact that the judges of

this court were divided in opinion upon the question whether the decree should be reversed or not, and, therefore, ordered an affirmance of the decree of the court below. The judgment of affirmance was the judgment of the entire court. The division of opinion between the judges was the reason for the entry of that judgment; but the reason is no part of the judgment itself." *Id.* at 110.

After reviewing English and American procedures and such United States Supreme Court cases as *The Antelope,* 23 U.S. (10 Wheat.) 66; *Etting,* 24 U.S. (11 Wheat.) 59, and *Brown v. Aspden,* 55 U.S. (14 How.) 25 (1853), Justice Field concluded for the Court:

"The statement which always accompanies a judgment in such case, that it is rendered by a divided court, is only intended to show that there was a division among the judges upon the questions of law or fact involved, not that there was any disagreement as to the judgment to be entered upon such division. It serves to explain the absence of any opinion in the cause, and prevents the decision from becoming an authority for other cases of like character. But the judgment is as conclusive and binding in every respect upon the parties as if rendered upon the concurrence of all the judges upon every question involved in the case." 74 U.S. (7 Wall.) at 113.

Mandel obviously was not incarcerated in a federal prison upon the strength or authority of a nullity. The reasoning of Justice Field for the Supreme Court, of our own predecessors, and of the textwriters is sound. The conviction of Mandel in the United States District Court for the District of Maryland, duly affirmed upon appeal, is "a final judgment by a judicial tribunal in another proceeding convicting an attorney of a crime" within the purview of Rule BV10 e 1. Thus it is "conclusive proof of the guilt of the attorney of that crime." Hence, we shall not go behind the conviction.

## IV

Mandel urges that he was not convicted of a crime involving moral turpitude. He claims that his case is distinguishable from *Klauber III,* 289 Md. 446. In that case we said, after quoting from the mail fraud statute which has undergone no significant change since its enactment in 1909:

"The most recent opinion of the Supreme Court on this statute is *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L. Ed. 435 (1954), in which Chief Justice Warren said for the Court:

The elements of the offense of mail fraud under 18 U.S.C. (Supp. V) § 1341 are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme. It is not necessary that the scheme contemplate the use of the mails as an essential element. *United States v. Young,* 232 U.S. 155. [*Id.* at 8.]

"In reviewing convictions under this statute the federal appellate courts consistently have said that to convict under this statute these elements must be established. They usually cite *Pereira* to this effect. See, e.g., *United States v. Bohonus,* 628 F.2d 1167, 1171 (9th Cir.), *cert. denied,* 447 U.S. 928, 100 S. Ct. 3026 (1980); *United States v. Wrehe,* 628 F.2d 1079, 1082 (8th Cir. 1980); *United States v. Jordan,* 626 F.2d 928, 930 (D.C. Cir. 1980); *United States v. Rodgers,* 624 F.2d 1303, 1306 (5th Cir. 1980); *United States v. Freeman,* 619 F.2d 1112, 1117 (5th Cir. 1980); *United States v. Brien,* 617 F.2d 299, 307 (1st Cir.), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854 (1980); *DeMier v. United States,* 616 F.2d 366, 369 (8th Cir. 1980); *United States v. Kent,* 608 F.2d 542, 545 (5th Cir. 1979), *cert. denied,* 446 U.S. 936 (1980); *United States v. Corbin,* 590 F.2d 398, 402 (1st Cir. 1979); *United States v. McDonald,* 576 F.2d 1350, 1359 (9th Cir.), *cert. denied,* 439

U.S. 830 (1978); *United States v. Pearlstein,* 576 F.2d 531, 537 (3d Cir. 1978); *United States v. Foshee,* 569 F.2d 401, 403 (5th Cir. 1978), *cert. denied,* 444 U.S. 1082 (1979); *United States v. McNeive,* 536 F.2d 1245, 1247 (8th Cir. 1976); *United States v. Bush,* 522 F.2d 641, 648 (7th Cir. 1975), *cert. denied,* 424 U.S. 977 (1976); *United States v. Bryza,* 522 F.2d 414, 421 (7th Cir. 1975), *cert. denied,* 426 U.S. 912 (1976); *United States v. Payne,* 474 F.2d 603, 604 (9th Cir. 1973); and *United States v. Bessesen,* 445 F.2d 463, 468-69 (7th Cir.), *cert. denied,* 404 U.S. 984 (1971)." 289 Md. at 450-51.

A number of holdings to the same effect can now be added to this list of federal cases on the point: *United States v. Smith,* 685 F.2d 1293, 1295 (11th Cir. 1982); *United States v. Curry,* 681 F.2d 406, 410 (5th Cir. 1982); *United States v. Murr,* 681 F.2d 246, 248 (4th Cir. 1982); *United States v. Lemm,* 680 F.2d 1193, 1205 (8th Cir. 1982); *United States v. Hartley,* 678 F.2d 961, 985 (11th Cir. 1982); *United States v. Bosby,* 675 F.2d 1174, 1183 (11th Cir. 1982); *United States v. White,* 673 F.2d 299, 302 (10th Cir. 1982); *United States v. Sturm,* 671 F.2d 749, 751 (3d Cir. 1982); *United States v. Shelton,* 669 F.2d 446, 454-55 (7th Cir.), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989 (1982); *United States v. Bonnette,* 663 F.2d 495, 498 (4th Cir. 1981), *cert. denied,* 455 U.S. 951, 102 S.Ct. 1456 (1982); *United States v. Benmuhar,* 658 F.2d 14, 16-17 (1st Cir. 1981), *cert. denied,* U.S. 102 S.Ct. 2927 (1982); *United States v. Blecker,* 657 F.2d 629, 636 (4th Cir. 1981), *cert. denied,* 454 U.S. 1150, 102 S.Ct. 1016 (1982); *United States v. Diggs,* 649 F.2d 731, 736 (9th Cir.), *cert. denied,* 454 U.S. 970, 102 S.Ct. 516 (1981); *United States v. Wolf,* 645 F.2d 23, 26 (10th Cir. 1981); and *United States v. Pintar,* 630 F.2d 1270, 1279 (8th Cir. 1980).

Mandel recognizes those cases, as he must, but he still urges the Court that his conduct did not involve moral turpitude. He points out:

"In *Klauber* III and *Pine, supra,* the predicate federal mail frauds were like those traditionally within the scope of the mail fraud statute. There was clear financial loss to the victims. The scheme or artifice grew out of conduct of a law practice. The fraud was simple, the court's instructions to the jury were clear, and the convictions were readily affirmed on appeal without a whimper of dissent, let alone equal division. The predicate federal proceeding against [Mandel], on the contrary, was vastly dissimilar. In it, 'the mail fraud statute [was carried] near its outer limits, and some cases may arguably indicate beyond.' *United States v. Mandel,* 602 F.2d 653, 656 (4th Cir. 1979) (Widener, J., dissenting)." (Last brackets in original.)

We point out, however, that Judge Widener in the majority opinion in *Mandel I,* 591 F.2d 1347, as we have already quoted, upheld for the court those "outer limits" of mail fraud. There was no dissent on that point. It thus is significant to note that in *Mandel I* Judge Widener said for the court:

"The gist of the mail fraud counts of the indictment charged that beginning between January 7, 1969 and the spring of 1971, and continuing thereafter to the date of the filing of the indictment, Appellants devised and intended to devise a scheme and artifice:

'(a) To defraud the citizens of the State of Maryland, and its governmental departments, agencies, officials and employees, both executive and legislative, of their right to the conscientious, loyal, faithful, disinterested and unbiased services, actions and performance of official duties of MARVIN MANDEL, in his official capacities as Governor of the State of Maryland, free from bribery, corruption, partiality, willful omission, bias,

dishonesty, deceit, official misconduct and fraud;

'(b) To defraud the citizens of the State of Maryland, and its governmental departments, agencies, officials and employees, both executive and legislative, of their right to have the state's business and its affairs conducted honestly, impartially, free from bribery, corruption, bias, dishonesty, deceit, official misconduct and fraud, and in accordance with the laws and Code of Ethics of the State of Maryland;

'(c) To defraud the citizens of the State of Maryland, and its governmental departments, agencies, officials and employees, both executive and legislative, of their right to have available and to be made aware of all relevant and pertinent facts and circumstances when:

(1) drafting, considering and deliberating upon proposed legislation for the State of Maryland with respect to the Maryland horse racing industry and to other matters;

(2) administering the laws of the State of Maryland with respect to the Maryland horse racing industry and to other matters; and

(3) transacting business for and on behalf of the State of Maryland;

'(d) To obtain, directly and indirectly, money, property and other things of value, by means of false and fraudulent pretenses, representations, and promises, and the concealment of material facts, relating to the Marlboro Race Track, the Bowie Race Track, the Security Investment Company, Ray's Point, Inc., and to other matters.' (from count 1, para. 13, of the indictment).

Paragraphs 14 through 32 of count 1 set forth the specifics of the alleged scheme to defraud. These specifics include allegations of bribery and the misrepresentation and concealment of material information on the part of the Appellants. Counts 2 to 20 incorporate by reference the allegations contained in count 1 and charge Appellants with various particular uses of the mails in the execution of the alleged scheme.

"In the racketeering counts, the government charged Governor Mandel in count 21 with acquiring and maintaining an interest in and control of the Security Investment Company through a pattern of racketeering activity that included mail fraud and bribery." 591 F.2d at 1353.

Mandel was convicted by a jury under that indictment. It is apparent that one of the issues presented by Mandel on appeal was the sufficiency of the evidence.[5] See the discus-

---

5. We observe that a not guilty verdict in a criminal proceeding does not insulate an attorney from disciplinary action based upon the same allegations. In *Maryland St. Bar Ass'n v. Frank,* 272 Md. 528, 535, 325 A.2d 718 (1974), we said that Frank was charged "with engaging in unprofessional conduct comprising the same acts alleged in the criminal proceeding." Judge Digges went on to say for the Court:

"If not all, certainly the vast majority of this country's courts support the conclusion that the principles of double jeopardy or res judicata are no bar to a disciplinary proceeding which follows the disposition of a criminal indictment, though based on substantially the same conduct. See, *e.g., In re Echeles,* 430 F.2d 347 (7th Cir. 1970); *In re Pennica,* 36 N.J. 401, 177 A.2d 721 (1962); *In re Browning,* 23 Ill.2d 483, 179 N.E.2d 14 (1961); 123 A.L.R. 779 (1939); 7 Am. Jur.2d, *Attorneys at Law,* § 57 (1963); *H. Drinker, Legal Ethics* 37 (1963). We agree with the Supreme Court of New Jersey in *In re Pennica, supra,* when it reasoned that res judicata cannot apply to disciplinary proceedings which follow an acquittal of criminal charges based on substantially the same conduct because

'not only are the parties different but the purposes of the two proceedings are different. In the disciplinary matter, the primary purpose is not to punish an offender; it is to protect the public against members of the bar who are unworthy of the trust and confidence essential to the relationship of attorney and client; it is to ascertain whether the conduct of the attorney involved has demonstrated his unfitness to practice law, and if so to deprive him of his previously acquired privilege to serve as

sion of this issue in *Mandel I* by the majority opinion, which did not believe it was necessary to decide the point, 591 F.2d at 1373-74, and the dissent, 591 F.2d at 1386-87, which concluded that there was sufficient evidence. Hence, it is important to note that the en banc court found sufficient evidence to convict since it stated, "A majority of the members of the *en banc* court would affirm the judgments of conviction against *all* of the contentions of the appellants except the claim of error in the charge to the jury which was the point upon which there was equal division." 602 F.2d at 653. (Second emphasis added.) In *Mandel I* the court further stated in discussing the mail fraud statute:

> "As a result of the failure to limit the term 'scheme or artifice to defraud' to common law definitions of fraud and false pretenses and schemes prohibited by State law, the mail fraud statute generally has been available to prosecute a scheme involving deception that employs the mails in its execution that is contrary to public policy and conflicts with accepted standards of moral uprightness, fundamental honesty, fair play and right dealing." 591 F.2d at 1361.

No one has challenged the accuracy of the statement in the dissent in *Mandel I* concerning jury instructions:

> "The judge instructed the jury that a scheme to defraud is a necessary element of a mail fraud offense and that a scheme to defraud involves 'intentional use of false or fraudulent representations.'

---

an officer of the court. [citations omitted] Moreover, the *quantum* of proof required to warrant discipline or disbarment is different from that demanded for conviction of a criminal charge.' *Id.* at 730." 272 Md. at 535-36 (brackets in original).

He further quoted for the Court from *In re Echeles,* 430 F.2d 347 (7th Cir. 1970), and from the dictum in *Scott v. State,* 238 Md. 265, 277, 208 A.2d 575 (1965). We concluded there that Frank should be disciplined and disbarred. The "accusations stemmed from the facts disclosed at the criminal trial in Kent County in which [Frank] was tried on charges of bribery and attempted obstruction of justice," with reliance upon the criminal trial transcript. 272 Md. at 537.

He also told the jury that Mandel could not be convicted of mail fraud unless he had knowingly participated in the scheme to defraud alleged in the indictment. He emphasized this by explaining: 'The purpose of adding the word "knowingly" is to ensure that no one will be convicted for an act done because of mistake, or accident, or other innocent reason.' Elsewhere in the instructions, the judge fully explained the alleged scheme and set forth the government's contentions, which embraced proof that Mandel knowingly promoted the interests of his friends." 591 F.2d at 1379.

It thus will be seen that fraud was the very essence of the charge under which Mandel was convicted. Accordingly, until the Supreme Court holds that fraud is not one of the elements of the offense of mail fraud which must be proved in order to convict under that statute, we hold as we did in *Klauber III,* 289 Md. at 458, and *Maryland St. Bar Ass'n v. Kerr,* 272 Md. 687, 690, 326 A.2d 180 (1974), mail fraud is "a crime plainly involving moral turpitude." Hence Mandel stands convicted of a crime involving moral turpitude. The fact that clients suffered no loss does not make Mandel's acts any less fraudulent.

## V

Having concluded that Mandel was convicted of a crime involving moral turpitude, the question presented is the sanction to be imposed. It is urged upon us that he "has suffered enough," that "[s]ince 1977, [Mandel] has been under suspension while he sweated through a tortuous appellate process and endured a nineteen month incarceration," that his "lawyer's license" has "never [been] blemished as an attorney," and that "[f]ive years — already served in suspended status — is enough." These statements miss the point.

We said in *Siegel,* 275 Md. 521, relative to "compelling extenuating circumstances":

> "Those considerations which potentially could merit this designation, even though the respondent has been convicted of a crime involving moral turpitude, are only those which may cause this Court to view the conviction in a light which tends to show that the respondent's illegal act, committed in violation of a criminal statute, resulted from intensely strained circumstances or that the magnitude and the nature of the crime are not so severe as to compel disbarment." 275 Md. at 527.

The circumstances cited do not tend to show that Mandel's "illegal act[s], committed in violation of a criminal statute, resulted from intensely strained circumstances or that the magnitude and the nature of the crime are not so severe as to compel disbarment." An example of "intensely strained circumstances" involved in the commission of a crime would be if a man were to steal milk for his starving children. See *Attorney Griev. Comm'n v. Flynn,* 283 Md. 41, 45-46, 387 A.2d 775 (1978), for a case which met the test of *Siegel.* The compelling extenuating circumstances there existed "at the time of the commission of the dishonest and otherwise improper acts . . . ." The "circumstances" argued here concern not the commission of the crime itself, but its aftermath. Hence, they are not compelling extenuating circumstances as that term is used in our cases.

What Judge Digges said for the Court in *Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 318 A.2d 811 (1974), bears repeating here:

> "A court has the duty, since attorneys are its officers, to insist upon the maintenance of the integrity of the bar and to prevent the transgressions of an individual lawyer from bringing its image into disrepute. Disciplinary procedures have been established for this purpose, not for punishment, but rather as a catharsis for the profession and a prophylactic for the public. *Balliet v. Balto. Co. Bar Ass'n,* 259 Md. 474, 270 A.2d 465 (1970). The administration of justice under our adversary sys-

tem largely depends upon the public's ability to rely on the honesty of attorneys who are placed in a position of being called upon to conduct the affairs of others both in and out of court. Although a court's power to disbar should be exercised only with restraint, '[w]hen . . . unworthiness is shown to be present . . . it becomes our sad duty, but nonetheless our obligation to withdraw the privilege to practice law earlier granted by this Court. To fail to do so will impliedly represent to the public that the attorney continues to possess the basic qualities of honor traditionally associated with members of the bar of this State.' *Bar Ass'n v. Marshall,* 269 Md. 510, 519-20, 307 A.2d 677 (1973). In a proceeding such as this, therefore, the underlying question is 'whether, after the conduct of this man, it is proper that he should continue [as] a member of [the legal] profession . . . .' *Ex parte Brownshall,* 2 Cowp. 829 (1778). In the absence of a compelling exculpatory explanation, we think that the answer to this question must be no when an attorney is found guilty of a crime which is deemed to involve moral turpitude and the offense entails the employment of dishonesty, fraud, or deceit which is perpetrated to enrich the offending attorney or to enhance his own well-being at the expense of his client, the state, or any other individual.

"As can be discerned from this statement, we see no significant moral distinction between willfully defrauding and cheating for personal gain a client, an individual, or the government. Cheating one's client and defrauding the government are reprehensible in equal degree." 271 Md. at 549-50.

\* \* \*

". . . [T]his Court has consistently adhered to the view, both prior to 1970 (when we reviewed disciplinary actions only on appeal at the instance of the respondent-attorney), *Balliet v. Balto. Co. Bar*

*Ass'n, supra; Fellner v. Bar Ass'n,* [213 Md. 243, 131 A.2d 729 (1957)]; *In the Matter of Lombard,* 242 Md. 202, 218 A.2d 208 (1966); *In Re Williams,* 180 Md. 689, 23 A.2d 7 (1941); and since that date (when we assumed original and complete jurisdiction over these proceedings), *Bar Ass'n v. Marshall,* [269 Md. 510, 307 A.2d 677 (1973)]; *Bar Ass'n v. Cockrell,* 270 Md. 686, 313 A.2d 816 (1974); *Maryland St. Bar Ass'n v. Callanan,* 271 Md. 554, 318 A.2d 809 (1974), that when a member of the bar is shown to be willfully dishonest for personal gain by means of fraud, deceit, cheating or like conduct, absent the most compelling extenuating circumstances, not shown to be present here, disbarment followed as a matter of course. To do other than disbar the respondent in this case, therefore, would constitute a travesty of our responsibility." *Id.* at 553.

No useful purpose would be served by citing and reviewing the host of cases in which we have made similar statements. The public interest is protected when we discipline an attorney since it demonstrates both to the public and to the legal profession the type of conduct on the part of officers of this Court which we will not tolerate without sanction. See, *e.g., Attorney Griev. Comm'n v. Kerpelman,* 288 Md. 341, 382, 420 A.2d 940, *cert. denied,* 450 U.S. 970 (1981); and *Attorney Griev. Comm'n v. Lockhart,* 285 Md. 586, 597, 403 A.2d 1241 (1979). No compelling circumstances justifying a sanction less than disbarment have been presented here. Thus, it follows that the sanction to be imposed is disbarment.

We are not unmindful of the fact that Mandel has already been suspended from the practice of law for almost five years and that the mental anguish of the prosecution, of the tortuous appellate process and of imprisonment might bear considerable weight if viewed from the standpoint of rehabilitation. Thus, were he to apply for reinstatement after passage of an appropriate period of time, we observe that the number of years one would normally expect to pass after

disbarment before one may file a meaningful application for reinstatement might be somewhat shortened in his instance.

> *It is so ordered; respondent shall pay all costs as taxed by the Clerk of this Court, including costs of all transcripts, pursuant to Maryland Rule BV 15 c, for which sum judgment is entered in favor of the Attorney Grievance Commission against Marvin Mandel.*

*Garrity, J., concurring:*

Because of the inability or unwillingness of the United States Court of Appeals for the Fourth Circuit to reach a determination on the crucial issue of whether the jury had been properly instructed as to the mail fraud count,[1] I am most concerned with being compelled to accept "as conclusive proof" of guilt the verdict of a jury that "may easily have been misled". *United States v. Mandel,* 591 F.2d 1347, 1365 (4th Cir. 1979) (*Mandel I*). By the trial court's refusal to instruct the jury on Governor Mandel's established theories of defense to which he was entitled as a matter of fundamental fairness and established law, due process may very well have been denied. *United States v. Mandel,* 602 F.2d 653 (4th Cir. 1979) (*Mandel II*) (Widener, J., dissenting).

Regardless of the degree of my reluctance and discontent, I am constrained to follow the mandate of Md. Rule BV10 e 1 which declares that:

> [A] final judgment by a judicial tribunal in another proceeding convicting an attorney of a crime shall be conclusive proof of the guilt of the attorney of that crime.

In concurring with my brothers, however, I must relate

---

1. United States v. Mandel, 609 F.2d 1076 (4th Cir. 1979) (Mandel III) (statement by Murnaghan, J.).

the foundation of my concern that the present mandate of Md. Rule BV10 e 1, while intending to avoid the retrial of a criminal charge, may deny due process to a member of the Maryland Bar. Where the respondent contends that a substantial denial of due process has been visited upon him by a federal or sister state tribunal, wherein the reviewing court has been unable to reach a determination of an issue that would require reversal under Maryland's higher standard of due process as guaranteed by the Maryland Declaration of Rights, we should be able to review the contention.[2] Maryland's present rules as to disbarment set an inflexible rein on this Court, precluding us from making an independent evaluation of the underlying circumstances of any judgment of conviction, even in an instance where a jury's verdict is affirmed by virtue of a reviewing court's inability to reach a determination as to whether or not the attorney was afforded a fair trial.

Although of no direct benefit to the respondent in this matter, a brief review of the mail fraud instruction issue shall serve to highlight the need for some degree of flexibility under Md. Rule BV10 e 1 regarding criminal convictions of a Maryland attorney by federal or sister state tribunals.

It is important to note that any scheme contrary to public policy that involves deception can be prosecuted under the mail fraud statute if the mails are used in the execution of the scheme. *See, e.g., United States v. Edwards,* 458 F.2d 875, 880 (5th Cir. 1972) cert. den. 409 U.S. 891, 93 S.Ct. 118, 34 L.Ed. 2d 148.

---

**2.** Judge Grady in his opinion stated:

While the Supreme Court of the United States and the lesser federal courts regard themselves as the repository of ultimate knowledge on what constitutes due process and frequently find fault with state courts in this regard, the *dubious due process* the Respondent received in the course of his appeal fails to measure up to that afforded any criminal defendant by the Maryland appellate courts. Scholarly analyses *highly critical* of the appellate courts in Respondent's case have appeared in: Note, *United States v. Mandel:* The Mail Fraud and En Banc Procedural Issues, 40 Md. L. Rev. 550 (1981) and Note, *United States v. Mandel:* The Problem of Evenly Divided Votes in En Banc Hearings in the United States Court of Appeals, 66 Va. L. Rev. 919 (1980). (Emphasis added).

According to the majority in *Mandel I,*

> Based upon the indictment and the record in this case, the Appellants could have been convicted of mail fraud only if one or more of the following schemes to defraud were proven: a scheme involving the bribery or attempted bribery of Governor Mandel; or, a scheme involving the fraudulent misrepresentation of facts to, or such concealment of true facts from, the Maryland General Assembly and the Maryland Racing Commission for the purpose of obtaining legislation, racing days, and other things financially beneficial to those interested in Marlboro and later Bowie. *Mandel I, supra,* at 1365.

Contrary to its argument on appeal that bribery was relevant to the mail fraud count, the government convinced the trial judge to refuse the defendants' request to instruct the jury as to the crucial difference between a mere gift or good will expenditure and the receipt of a benefit or *quid pro quo* for some official act favorable to the donor. *Mandel II, supra,* at 655.

The majority in *Mandel I* concluded:

> The failure by the district court to instruct the jury on the distinction between legally innocent benefits and bribes in the context of the mail fraud counts leads us to the conclusion that the jury may easily have been misled. . . . *Mandel I, supra,* at 1365.

As to the element of misrepresentation or concealment of the names of the true owners of the Marlboro Race Track, Governor Mandel contended that the district court erred in refusing to instruct the jury as to the necessity of finding that he had knowledge that some or all of the other defendants were the true owners of Marlboro Race Track at the time the race track legislation was being considered by the

Maryland General Assembly before the jury could find him guilty of mail fraud.

The majority in *Mandel* concluded:

> We think it was necessary for the jury to be charged that Governor Mandel could not be convicted under § 1341 for engaging in a scheme to defraud that involved the fraudulent misrepresentation of facts to, or such concealment of material information from, the 1972 Maryland General Assembly, without first finding that he knew that some or all of the other Appellants were among the true owners of Marlboro Race Track during the 1972 session of the Maryland General Assembly. . . . If Governor Mandel did not know who any of the real owners of Marlboro were during the 1972 legislative session of the Maryland General Assembly, he could hardly have participated with specific intent, in the context of this case, in a scheme to defraud that involved the misrepresentation or concealment of the names of the true owners of Marlboro from the Maryland General Assembly. . . . *Mandel I, supra,* at 1365.

As Judge Widener further stated in his dissent in *Mandel II:*

> This is an involved case. The prosecution rests on fragmented circumstances, many of the more essential ones being no more than mere rumor and legislative corridor gossip. In such a case, is not a defendant entitled to precise instructions? What was done here was, however, more likely to confuse and mislead than to provide clear guidance for the jury. And that should entitle the defendants to a new trial. The error is not insubstantial; it is fundamental. *Mandel II, supra,* at 655.

Under Maryland law, any person who has been accused of committing a criminal offense is entitled as a matter of constitutional right to have the jury instructed on every question or point of law essential to the crime charged which

is supported by an evidentiary foundation when a request for such an instruction has been made. The refusal to so instruct, is reversible error. *Hardison v. State,* 226 Md. 53, 172 A.2d 407 (1961), (wherein this Court reversed judgments of conviction for grand larceny and breaking and entering upon the trial court's refusal to instruct the jury with respect to the definition of an accomplice and the law regarding the necessary corroboration of an accomplice's testimony); *Pulley v. State,* 38 Md. App. 682, 382 A.2d 621 (1978), (wherein the Court of Special Appeals reversed a judgment of conviction for first degree murder upon the trial court's refusal to give an alibi instruction); and *Mumford v. State,* 19 Md. App. 640, 313 A.2d 563 (1974), (wherein the Court of Special Appeals reversed a judgment of conviction for felony-murder upon the trial court's refusal to give an instruction that if the jurors found that a co-defendant could not have expected her companions to commit a rape which resulted in the victim's death, she could not be found guilty.)

Indeed, Judge Widener in *Mandel II,* when expressing his thoughts regarding Governor Mandel's right, as a universally recognized and accepted time honored principle, to have the jury instructed on his crucial theories of defense relating to the mail fraud elements of concealment or misrepresentation of facts and bribery, stated:

> [E]very circuit, including this court, has embraced the principle that a criminal defendant is *entitled* to an instruction on any theory of defense for which there is a foundation in the evidence. See e.g., *United States v. Swallow,* 511 F.2d 415, 523 (10th Cir. 1975), cert. den., 423 U.S. 845, 96 S.Ct. 82, 46 L.Ed.2d 66; *United States v. Mitchell,* 495 F.2d 285, 287-88 (4th Cir. 1974); *United States v. Noah,* 475 F.2d 688, 697 (9th Cir. 1973), cert. den., 414 U.S. 1095, 94 S.Ct. 728, 38 L.Ed.2d 54; *United States v. Dana,* 457 F.2d 205, 208 (7th Cir. 1972); *United States v. Blair,* 456 F.2d 514, 520 (3rd Cir. 1972); *United States v. Leach,* 427 F.2d 1107, 1112 (1st Cir. 1970), cert. den., 400 U.S. 829, 91 S.Ct. 57,

27 L.Ed.2d 59; *United States v. Blane,* 375 F.2d 249, 252 (6th Cir. 1967), cert. den., 389 U.S. 835, 88 S.Ct. 41, 19 L.Ed.2d 96; *Perez v. United States,* 297 F.2d 12, 15-16 (5th Cir. 1961); *Apel v. United States,* 247 F.2d 277, 282 (8th Cir. 1957); *United States v. O'Connor,* 237 F.2d 466, 474, n. 8 (2d Cir. 1956); *Tatum v. United States,* 88 U.S.App.D.C. 386, 190 F.2d 612, 617 (1951). The district court's refusal to give the substance of defendant's requested instructions on bribery and knowledge in connection with the mail fraud counts of the indictment clearly violated this principle. *Mandel II, supra* at 656.

Although it is my firm belief, as it was Judge Widener's and Judge Russell's, who joined in the dissent, "that the jury was inadequately and prejudicially charged in this case",[3] by virtue of our "conclusive evidence of guilt" rule, the inflexible curtain has fallen, and the painful sanction of disbarment can neither be prevented nor completely remedied — not even by the passage of time.

---

3. Mandel II, supra, at 656.